UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| James Sharbono, | Case Type: Employment |
| Plaintiff, | |
| vs. | |
| | **COMPLAINT** |
| Xcel Energy, Inc., | **JURY TRIAL DEMANDED** |
| Defendant. | Court File No. _____ |

Plaintiff, by his attorneys, Fabian May & Anderson, PLLP, brings this action for damages and other legal and equitable relief for Defendant's violations of law. Plaintiff states the following as his claims against Defendant:

## JURISDICTION AND VENUE

1. This action arises under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended by the Americans with Disabilities Act Amendments Act of 2008. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331.

2. Plaintiff also asserts claims under Minnesota state law. Jurisdiction for Plaintiff's Minnesota state law claims is conferred upon this Court by 28 U.S.C. § 1367.

3. The unlawful practices described hereinafter have been committed in the District of Minnesota, the employment records relevant to those practices are, upon information and belief, maintained and administered at the offices of Defendant in the District of Minnesota, and Defendant does business within Minnesota. Therefore, venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

4. Plaintiff James Sharbono ("Plaintiff" or "Sharbono") is an individual who resides in the City of Sartell, County of Sterns, State of Minnesota.

5. Defendant Xcel Energy, Inc. ("Defendant" or "Xcel") is a domestic corporation formed under the laws of the State of Minnesota, with a registered office address of 2345 Rice Street, Suite 230, City of Roseville, County of Ramsey, State of Minnesota.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

6. Prior to his employment with Defendant, Plaintiff worked as a Lineman for Okay Construction Co., Inc. ("Okay Construction"). In 1991, while at work, Plaintiff was electrocuted with 7,200 volts of electricity when a coworker mistakenly energized a line Plaintiff was working on. The electricity coursed through Plaintiff's right shoulder and exited through his left foot. As a result, Plaintiff lost toes and had his foot surgically rebuilt. Plaintiff's injury has resulted in a long-term physical impairment (hereinafter referred to as Plaintiff's "disability") that substantially and materially limits his ability to perform certain major life activities, including but not necessarily limited to walking, standing, and working.

7. Plaintiff began working as a contract employee for Northern States Power in 1993 and was hired as a full-time Company Lineman on July 14, 1997, just prior to the formation of Xcel Energy, Inc. Despite his disability, Plaintiff was able to perform the essential functions of his position.

8.     Defendant has a protective safety-toe boot requirement for workers in Plaintiff's position. From 1993 to 2008, Defendant waived this protective boot requirement as an accommodation for Plaintiff's disability. Plaintiff's medical providers had supported this accommodation.

9.     In or around February 2008, Don Foreman ("Foreman"), Plaintiff's new supervisor, called a meeting to go over the new safety-toe footwear policy. After the meeting, Foreman called Plaintiff into his office, inexplicably revoked Plaintiff's accommodation, and told him that he was now requiring Plaintiff wear the safety-toe boots. Plaintiff explained to Foreman that wearing the safety-toe boots would aggravate his foot issues, and offered to provide Foreman with an updated doctor's note stating as such. Soon thereafter, Plaintiff provided Foreman with letters from two of his medical providers, dated February 18, 2008 and February 26, 2008, which recommended against Plaintiff wearing the safety-toe boots and suggested he wear the footwear Defendant had previously allowed him to wear.

10.    Despite Plaintiff's doctor's notes, Foreman told Plaintiff he was required to wear the safety-toe boots as a condition of his job and that he had three days to begin wearing the safety-toe boots or he would be fired. Plaintiff requested this requirement be put in writing but Foreman refused. Plaintiff complied and began wearing the safety-toe boots on February 19, 2008. Almost immediately after Plaintiff began wearing the safety-toe boots, he experienced abrasions, burning symptoms, and severe foot pain with respect to his left foot. On March 5, 2008, Plaintiff filed a First Report of Injury for the pain and

complications he was experiencing as a result of being forced to wear the safety-toe boots at Defendant.

11.     Plaintiff went out on medical leave at the recommendation of his medical provider beginning on March 5, 2008 due to the pain and complications he was experiencing as a result of being forced to wear the safety-toe boot.

12.     In or around late March 2008, Plaintiff had a conversation with Lori Norman ("Norman"), a Claims Specialty Team Leader with SFM, regarding his workers' compensation claim with Okay Construction for his foot injury. During this conversation, Plaintiff informed Norman that that he was currently off work due to the abrasions caused by the safety-toe boots that Defendant was requiring he wear, that he had developed a stress disorder as a result, that the current injury/abrasions might result in further physical incapacity, and that he was concerned that he was going to lose his job. Norman informed Plaintiff that SFM's Loss Prevention Team Leader spoke with the Occupational Safety and Health Administration ("OSHA") about the issue and learned that compliance would not be an issue if Defendant went about implementing the best possible solution in a systematic and documented manner. Norman also informed Plaintiff that OSHA would be willing to talk to Defendant about the issue. Plaintiff informed Foreman about SFM's conversation with OSHA and again requested a reasonable accommodation for his disability.

13.     In or around this time, Plaintiff also provided Defendant with another letter from his medical provider which explained that the boot he was being required to wear for work contributed to pain in his left foot as a result of the biomechanical abnormalities

remaining on his foot and that it was this injury that had caused his recent exacerbation of depression and anxiety.

14. On April 7, 2008, Defendant appointed its own physician, Dr. Thomas Jetzer ("Jetzer"), to examine Plaintiff. Dr. Jetzer concurred with the recommendations of Plaintiff's medical providers that Plaintiff should not wear the safety-toe boot on his left foot. Dr. Jetzer further remarked that in Plaintiff's case the safety-toe boot requirement was nonsensical, as there was "nothing on the left foot to protect."

15. On April 9, 2008, Plaintiff returned to work full-time, but continued to have the same problems with the safety-toe boot.

16. In or around May or June 2008, Defendant had Plaintiff order specialized boots. However, after Plaintiff had the boots made he was told by Steven Christensen ("Christensen") of Defendant's Workforce Relations department that he could not wear them. Plaintiff specifically asked Christensen, "Did you tell me that I could have these boots made and wear them?" Christensen answered "Yes." Foreman then commented, "You can wear those boots at home all you want but you won't wear them here."

17. In or around August 2008, Scott Swortaut, Plaintiff's supervisor, told Plaintiff's wife during a visit to Plaintiff's home that she should convince Plaintiff to back off the safety-toe boot issue otherwise he would continue to have problems at work.

18. Defendant sent Plaintiff to see Louis Winskowski ("Winskowski") in "Foot Support." Winskowski recommended that Plaintiff wrap his foot in gauze when wearing the safety-toe boots to prevent further abrasions. Plaintiff did so, and while the gauze wrap helped with his abrasions, it did not help with Plaintiff's intense pain.

19. In or around the summer of 2009, Foreman brought Plaintiff into his office for a meeting and told him that he was filing too many workers' compensation claims. During this meeting, Plaintiff noticed that in his file his leave during March and April of 2008 had been characterized as medical leave due to a "mental breakdown."

20. Plaintiff continued to work to the best of his ability wearing the safety-toe boot. However, he continued to experience intense pain, along with headaches and stress-related symptoms. Beginning in or around August 2010, Plaintiff's pain and related symptoms increased to the point that he had to take time off of work.

21. In October of 2011, Plaintiff filed for intermittent medical leave under the Family and Medical Leave Act ("FMLA") leave in order to cope with his pain, related symptoms, and frequent medical appointments associated with his disability.

22. On April 12, 2012, Plaintiff's new supervisor, Brenda McDermott ("McDermott"), told Plaintiff that all FMLA leave must be taken in half or full day increments, even when his appointment took less time. Plaintiff requested as an accommodation for his disability that he not be required to wear a safety-toe boot that caused him pain. McDermott told Plaintiff that someone else "higher up" would need to respond to his request for accommodation and that she would get back to him. Plaintiff also reminded McDermott that for years he had not been required by any supervisor to wear the safety-toe boot until Foreman became his supervisor. McDermott never got back to Plaintiff regarding his request for a reasonable accommodation.

23. By May of 2012, Plaintiff still had not received an accommodation for his disability. On May 11, 2012, Plaintiff began taking full-time FMLA leave from Defendant in connection with his disability.

24. On June 6, 2012, Plaintiff met with his physician, who determined that Plaintiff had suffered permanent nerve damage in his left foot likely caused by the safety-toe boot. Plaintiff's physician provided Defendant with a letter that informed Defendant that the safety-toe boot was exacerbating Plaintiff's neuropathic pain and worsening his disability. Plaintiff filed his second First Report of Injury with Defendant due to his disability.

25. In or around August of 2012, Defendant informed Plaintiff that Defendant intended to end Plaintiff's employment and provide him with a disability pension. Plaintiff did not agree and instead renewed his request for a reasonable accommodation for his disability so that he could continue to work for Defendant.

26. In or around October of 2012, Defendant provided Plaintiff with two options, either transition to disability retirement status or accept an assisted 90-day job search. Workforce Relations Consultant Karly Gilman ("Gilman") explained to Plaintiff that this "90-day job search" was not an offer to reassign Plaintiff or provide him with other work within Defendant. In fact, she informed Plaintiff that if he chose this option: 1) he was not guaranteed to get a job; 2) that even if he found the job it would not be a union job; 3) because it would not be a union job, he would lose his disability retirement benefits; and 4) therefore if his disability worsened and he were unable to perform the functions of his job he would be left without a job and without any disability benefits.

Gilman told Plaintiff that he should not elect the "90-day job search" option because of these extremely negative consequences. Because this left Plaintiff with no options other than to transition to disability retirement, Plaintiff wrote a letter to Defendant stating, "I have requested a reasonable accommodation with Xcel Energy and through their refusal, I feel I have to accept a work-related disability retirement."

27. On December 28, 2012, Defendant sent Plaintiff a letter scheduling him for a medical review by a specialist. Plaintiff met with the specialist, Dr. Lance Silverman of Silverman Orthopedics, on January 9, 2013. On February 18, 2013, McDermott called Plaintiff and relayed Dr. Silverman's determination that there were no restrictions preventing Plaintiff from performing line work. When Plaintiff asked McDermott whether Defendant would accommodate him by waiving the safety-toe boot requirement for his left foot, McDermott stated that with today's technology, there should be a way of making a boot that would work, or words to that effect.

28. By letter dated February 20, 2013, Defendant notified Plaintiff that Dr. Silverman had provided Defendant with a recommendation that Plaintiff be provided with a custom orthotic for his injured left foot and that an appointment had been scheduled for Plaintiff to have a boot constructed. Plaintiff attended the appointment Defendant had scheduled with Scott Langston ("Langston") of Minnesota Prosthetics and Orthotics on February 25, 2013. When Plaintiff arrived for his appointment with Langston, Langston told him that he did not know why he was there to see him. When Plaintiff told Langston that he had been referred by Dr. Silverman to be evaluated for a custom boot, Langston informed Plaintiff that Dr. Silverman had not given him the

8

referral to do so, and that he was only asked to evaluate Plaintiff and determine whether or not he was medically able to perform his job functions. Langston still met with Plaintiff, however, and the two discussed his foot problems and the possibility of having a custom boot made. However, because Langston had not been given a referral he did not actually assess Plaintiff's foot for purposes of fitting him with a custom boot. Langston told Plaintiff that he would contact Defendant and inquire about the referral from Dr. Silverman.

29. Pursuant to Defendant's instructions, Plaintiff returned to work on March 11, 2013. When Plaintiff returned to work he was not assigned his usual duties. When Plaintiff inquired about his work status, Defendant told him that it would take approximately two to four weeks for the custom boots to be made, and that Plaintiff would be assigned other duties until then.

30. A few days later, on March 14, 2013, McDermott sent Plaintiff home. Plaintiff was informed by Defendant it was not going to make a custom boot and that his employment would be terminated at the end of March 2013. Defendant transitioned Plaintiff to disability retirement status effective April 1, 2013.

## COUNT I

### DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, ET SEQ.

31. By reference hereto, Plaintiff incorporates the paragraphs above.

32. During all relevant times herein, Plaintiff was an "employee" within the meaning of 42 U.S.C. § 12111(4) and Defendant was a "covered entity" within the

meaning of 42 U.S.C. § 12111(2). Plaintiff is a "qualified individual with a disability" as defined by 42 U.S.C. § 12111(8).

33. The Americans with Disabilities Act provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

34. The term "discriminate against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . ." 42 U.S.C. § 12112(b)(5)(A).

35. By its conduct described above, Defendant violated 42 U.S.C. § 12101, *et seq*.

36. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered loss of income, emotional distress, and other damages in an amount in excess of $75,000.00.

## COUNT II

### RETALIATION IN VIOLATION OF
### THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, ET SEQ.

37. By reference hereto, Plaintiff incorporates the paragraphs above.

38. During all relevant times herein, Plaintiff was an "employee" within the meaning of 42 U.S.C. § 12111(4) and Defendant was a "covered entity" within the meaning of 42 U.S.C. § 12111(2).

39. The Americans with Disabilities Act provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. 42 U.S.C. § 12203(a).

40. By its conduct described above, Defendant violated 42 U.S.C. § 12101, *et seq*.

41. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered loss of income, emotional distress, and other damages in an amount in excess of $75,000.00.

## COUNT III

### DISABILITY DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT, MINN. STAT. § 363A.01, ET SEQ.

42. By reference hereto, Plaintiff incorporates the paragraphs above.

43. During all relevant times herein, Plaintiff was an "employee" within the meaning of Minn. Stat. § 363A.03, subd. 15 and Defendant was his "employer" within the meaning of Minn. Stat. § 363A.03, subd. 16.

44. The Minnesota Human Rights Act provides that it is an unfair employment practice for an employer to discharge or otherwise discriminate against an employee with respect to the terms, compensation, conditions, facilities, or privileges of employment because of the employee's disability. Minn. Stat. § 363A.08, subd. 2.

45. The Minnesota Human Rights Act provides that it is an unfair employment practice for an employer not to make reasonable accommodation to the known disability of a qualified disabled person. Minn. Stat. § 363A.08, subd. 6.

46. By its conduct as described above, Defendant violated Minn. Stat. § 363A.01, *et seq*.

47. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000.00.

## COUNT IV

### REPRISAL IN VIOLATION OF
### THE MINNESOTA HUMAN RIGHTS ACT, MINN. STAT. § 363A.01, ET SEQ.

48. By reference hereto, Plaintiff incorporates the paragraphs above.

49. During all relevant times herein, Plaintiff was an "employee" within the meaning of Minn. Stat. § 363A.03, subd. 15 and Defendant was his "employer" within the meaning of Minn. Stat. § 363A.03, subd. 16.

50. The Minnesota Human Rights Act provides that it is an "unfair discriminatory practice for any individual who participated in the alleged discrimination as a perpetrator, employer, labor organization, employment agency, public accommodation, public service, educational institution, or owner, lessor, lessee, sublessee, assignee or managing agent of any real property, or any real estate broker, real estate salesperson, or employee or agent thereof to intentionally engage in any reprisal against any person because that person . . . (1) opposed a practice forbidden under this

chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter . . ." Minn. Stat. § 363A. 15.

51. By its conduct as described above, Defendant violated Minn. Stat. § 363A.15.

52. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff James Sharbono prays for judgment against Defendant Xcel Energy, Inc. as follows:

1. For compensatory damages including loss of past and future income, emotional distress, and related damages;

2. For all damages permitted for violations of 42 U.S.C. § 12101 *et seq.*;

3. For all damages permitted for violations of Minn. Stat. § 363A.01 *et seq.*;

4. For punitive damages and all other damages available at law or equity;

5. For costs, disbursement, and attorneys' fees; and

6. For such relief the court deems just and equitable.

Dated:  08/21/2015                             s/Jenny M. Helling
                                              John A. Fabian, #13482X
                                              Jenny M. Helling, #393145
                                              ATTORNEYS FOR PLAINTIFF
                                              JAMES SHARBONO
                                              **FABIAN MAY & ANDERSON, PLLP**
                                              1625 Medical Arts Building
                                              825 Nicollet Mall
                                              Minneapolis, MN 55402
                                              Telephone:  (612) 353-3340
                                              jfabian@fmalawyers.com
                                              jhelling@fmalawyers.com