# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James Sharbono,

                    Plaintiff,

v.

Northern States Power Company, d/b/a
Xcel Energy, Inc.,

                    Defendant.

Civ. No. 15-3351 (RHK/LIB)
**MEMORANDUM OPINION
AND ORDER**

---

Jenny M. Helling, John A. Fabian, Fabian May & Anderson, PLLP, Minneapolis, Minnesota, for Plaintiff.

Britt M. Gilbertson, Emily M. Peterson, Gregory J. Stenmoe, Briggs and Morgan, P.A., Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

In this action, Plaintiff James Sharbono alleges that his former employer, Defendant Northern States Power Company d/b/a Xcel Energy ("NSP"), discriminated and retaliated against him when it terminated his employment on account of his disability, in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*  Presently before the Court is NSP's Motion for Summary Judgment.[1]  For the reasons that follow, the Motion will be granted.

---

[1] The parties also have cross-moved to exclude evidence from each other's expert witnesses under Federal Rule of Evidence 702 and <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S.

## BACKGROUND

Viewed in the light most favorable to Sharbono, the record reveals the following facts, most of which are undisputed.[2]

## I.       Sharbono's background and 1991 injury

In 1989, Sharbono began working as an electrical lineman, a position in which he built and maintained underground and overhead powerlines.  (Sharbono Dep. at 13-15.) The job was rigorous and required, among other things, lifting and carrying electrical equipment, operating heavy machinery, and digging and shoveling for powerline construction.  (Id. at 50-52, 57-58.)  The job also posed risks, including possible electrocution.  (Id. at 52-54.)

Sharbono experienced that risk firsthand in 1991 while working for a construction company.  In June of that year, one of his co-workers electrified a line on which he had been working, sending 7,200 volts of electricity into his body through his right shoulder and out his left foot.  (Id. at 17-19.)  The incident resulted in the loss of his two smallest toes, and half the middle toe, on his left foot; numerous skin grafts were required to repair the damage.  (Id. at 20-22.)  Despite the incident and his injuries, Sharbono continued working as a lineman, moving to NSP in 1993.  At the time he was hired, he informed

---

579 (1993).  Because the Court concludes summary judgment is appropriate, it need not and does not reach those Motions.

[2] The events giving rise to this case occurred over several years, and hence there were numerous persons involved.  To aid the reader in tracking those individuals and their relationships to this case, the Court has prepared a chart that is annexed to this Memorandum Opinion and Order.

NSP about his foot and advised that he was unable to wear a steel-toed safety boot as a result.  (Id. at 49-50, 77-79.)

From 1993 to 2008, Sharbono successfully worked as a lineman for NSP without wearing safety boots, even though company policy generally required linemen to wear such footwear.  (See Sharbono Decl. Ex. 1.)[3]  In fact, in October 2000, Sharbono's supervisor signed a footwear purchase authorization form on which he expressly provided, "No steel toe required for medical reasons" (Helling Decl. Ex. 33), although in his deposition Sharbono could not specifically recall asking for an accommodation (Sharbono Dep. at 80-81).

## II.    NSP enacts a new protective-equipment policy

In 2008, NSP created a new policy requiring employees to wear personal protective equipment ("PPE") "when working in areas where there is a danger of foot injuries due to falling or rolling objects, construction activities, when objects can pierce the sole and puncture the foot, or when employees' feet are exposed to electrical hazards."  (Wilhelm Decl. Ex. 3.)  The PPE policy specifically provided that safety-toed footwear was to be worn "to protect against impact, compression, puncture and electrical hazards" and "shall be marked with ASTM F2413," an international standard for protective footwear.  (Id.)[4]  Indeed, a regulation promulgated by the Occupational Safety

---

[3] The policy contained an exception when an employee provided a doctor's note indicating he "cannot wear safety toe footwear."  (Sharbono Decl. Ex. 1.)  But in his deposition, Sharbono could not recall providing such a note prior to 2008.  (Sharbono Dep. at 80.)

[4] As explained at oral argument, the mark (or "stamp," as the parties have referred to it) was to ensure NSP could easily ascertain whether employees were wearing compliant footwear.

and Health Administration ("OSHA") requires employers to "ensure that each . . . employee uses protective footwear when working in areas where there is a danger of foot injuries [or the] employee's feet are exposed to electrical hazards," and the footwear "must comply" with the ASTM standard.  29 C.F.R. § 1910.136.  The regulation, however, does not require that safety-toed footwear be *marked* as ASTM compliant.

In February 2008, Sharbono's supervisor, Dan Foreman, discussed the new PPE policy during a meeting.  (Sharbono Dep. at 85-86.)  Sharbono informed Foreman that he was not required to wear a steel-toed boot; Foreman, in turn, discussed the matter with his supervisor, John Stumph.  Sharbono provided Foreman with a note from his podiatrist, Dr. David Schleichert, indicating that he should not wear steel-toed footwear "due to an increased risk of a cold injury or abrasions from the steel cup in the shoes" (Wilhelm Decl. Ex. 4), but it was decided that Sharbono would not be exempted from the PPE policy and would be required to wear safety-toed boots.  (Foreman Dep. at 11-14; Sharbono Dep. at 86, 91-92; Sharbono Decl. Ex 2.)[5]

## III.   Sharbono has difficulty with steel-toed footwear and seeks alternatives

On March 3, 2008, Foreman provided Betty Post, NSP's Manager of Disability Solutions, a note he had received from Dr. Schleichert dated February 26, 2008.  (Helling Decl. Ex. 3.)  The note indicated that Sharbono had "developed wounds on his left foot since wearing safety toed shoes [for] 1 week," and it "recommended [that he] go back to previous boot that ha[d] not been a problem for him."  (Id.)  When passing along this

---

[5] Exhibit 2 is a set of handwritten notes prepared by Sharbono's wife allegedly describing conversations between Sharbono and Foreman.  (See Sharbono Decl. ¶ 3.)  Though they implicate hearsay concerns, NSP has not objected and the Court has considered the notes.

note, Foreman highlighted for Post the portion of NSP's *pre*-2008 policy that permitted exceptions for an employee submitting a doctor's note "stating he/she cannot wear safety toe footwear." (Id.)

In her deposition, Post could not recall doing anything with this information, but the following day, Karyn Davis, an NSP "corporate safety consultant," spoke with Sharbono to discuss ideas that would address his concerns with steel-toed boots. (Sharbono Dep. at 92-93.) She memorialized their conversation in a follow-up email, which included a recommendation that Sharbono try wearing "Smart Wool socks to reduce the abrasion[s]" on his foot. (Wilhelm Decl. Ex. 5.) In addition, Davis advised that she had spoken with an individual named Brad from Tingley Rubber Boot Company ("Tingley"), who had lost four toes in a landscaping accident. She relayed his suggestion that Sharbono try using Tingley's steel-toed "overshoes," for which he provided a free sample; the overshoes which were "ASTM F2413 approved and . . . designed to fit over your current footwear." (Id.) As an alternative, Davis recommended that Sharbono look into steel-toed footwear manufactured by "Georgia Giant," which had a "deeper toe box," and that he speak with his physician about wearing diabetic socks, which are "designed to increase blood flow." (Id.) Sharbono tried the Smart Wool socks and Tingley overshoes but determined they did not solve the problem, and he eventually discontinued them. (Sharbono Dep. at 93-97.)

On March 4, 2008, Sharbono visited Great Steps Prosthetics and Orthotics ("Great Steps") to discuss the possibility of creating a custom boot for his left foot. (Sharbono Dep. at 116-18; Wilhelm Decl. Ex. 9.) He explained the situation and inquired what

Great Steps could do to "modify[]ASTM certified" shoes.  (Wilhelm Decl. Ex. 9.)  Great Steps advised that it "cannot do this" because such a shoe would "lose the ASTM certification."  (Id.)  It also advised that it could not make a custom boot or shoe, as "this would also not meet the ASTM qualifications."  (Id.)

## IV.     Sharbono takes medical leave

On March 5, 2008, Sharbono saw his physician, Dr. Patrick Zook, complaining of injury from the steel-toed boots he had been wearing.  (Helling Decl. Ex. 35.)  He explained that NSP had accommodated his foot injury for 14 years by allowing him not to wear safety footwear, but his "supervisor recently insisted that the boots be worn despite concerns raised by both [him] and the recommendations of [his] doctors."  (Id.)  He further explained that he had begun to wear the boots on February 19 and they had "caused injury" to his left foot "due to the problems and repeated exposure to the cup portion of the boot."  (Id.)  Dr. Zook "removed" Sharbono from work, with an anticipated return-to-work date in "1-2 weeks."  (Id.)

On April 1, 2008, Dr. Zook authorized Sharbono to return to work part-time for a one-week period, after which he would be cleared to return to work full-time.  (Wilhelm Decl. Ex. 6.)  In a letter dated two days later, Dr. Schleichert explained safety-footwear options he had been discussing with Sharbono.  (Id. Ex. 7; see also Sharbono Dep. at 107-09.)  Those options included a custom-made boot, a boot with a modified toe, and a boot with its sole stiffened.  (Wilhelm Decl. Ex. 7.)  Dr. Schleichert rejected the first two options because the resulting boot would be "NON-ASTM certified," and NSP "requires ASTM certification."  (Id.)  The third option was rejected because a stiffened sole "would

put [Sharbono] at significant risk for knee, hip, and back injury due to the alteration of his gait" and would negatively affect his mobility, thereby increasing the risk of tripping. (Id.)  Dr. Schleichert once again opined that "it is not appropriate for [Sharbono] to wear a safety toed boot on his left foot and reasonable accommodation of this condition should [b]e made as it has been up to this point."  (Id.)  It is unclear who, if anyone, at NSP received this letter; the addressee was simply, "to whom it may concern."

Regardless, the company arranged for Sharbono to meet with Dr. Thomas Jetzer on April 7, 2008, to perform a fitness-for-duty evaluation.  (Helling Decl. Ex. 37; Sharbono Dep. at 110.)  Dr. Jetzer observed the abrasions on Sharbono's left foot and believed that Sharbono "may need to get a custom boot" or, alternatively, might have to wear a steel-toed boot only on his right foot.  (Helling Decl. Ex. 37.)  The latter option "could leave him [susceptible] to some potential damage on the left foot," although he recognized it "may be less of a risk than causing abrasions and breakdown of the skin grafts."  (Id.)  Dr. Jetzer stopped short of making a final recommendation, noting he might "require some discussion with some of the orthopedic footwear specialists."  (Id.)

Two days later, Dr. Jetzer sent a copy of his evaluation to Post at NSP.  (Wilhelm Decl. Ex. 8.)  The cover letter sent along with the evaluation indicated that Dr. Jetzer believed the "best solution" was to provide a "custom designed shoe [] covering his left big toe."  (Id.)  Although he opined this "could be done by a custom boot maker," the letter contains no indication whether he believed a custom boot could in fact be ASTM certified.  (Id.)

## V.      Sharbono explores footwear options

According to Sharbono, at some point in 2008, Great Steps advised him that it could, in fact, custom manufacture boots meeting the ASTM specifications, but which would not be "stamped" as ASTM compliant.  (Sharbono Dep. at 116.)  He relayed that information to Steve Christianson at NSP,[6] who instructed Sharbono to have the boots made.  (Id. at 118; see also Wilhelm Decl. Ex. 9 ("Jim has been approved for custom fabricated boots and we found a manufacturer . . . willing to do the modifications requested to the steel toe.").)  Sharbono had a cast of his foot made, which was reviewed and approved for construction into a boot by Dr. Jetzer.  (Helling Decl. Ex. 5.)  The total cost was $1,600; NSP paid $200 and Sharbono's workers' compensation insurer paid the rest.  (Id.)  But when the boots arrived several months later, NSP informed Sharbono that he could not wear them, for reasons not clear from the record.  (Sharbono Dep. at 125.)[7]

Instead, NSP arranged for Sharbono to meet with another orthotist, Louis Winskowski, of an entity called "Foot Support."  (Sharbono Dep. at 126; Wilhelm Decl. Ex. 10.)  Winskowski aided Sharbono in selecting several different models of steel-toed, ASTM-compliant boots that might work for his foot, and Sharbono ultimately obtained a model manufactured by Red Wing Shoes.  (Sharbono Dep. at 127.)  Winskowski advised that Sharbono should wrap his feet in gauze and tape and wear the Red Wing boots at

---

[6] The parties' Motion papers do not indicate Christianson's title.

[7] Sharbono's deposition testimony was unclear whether he was told he could not wear the boots because they did not comply with the ASTM standard or, rather, because they lacked an ASTM *stamp*.  (See Sharbono Dep. at 125 ("Q:  Did they explain to you why you couldn't wear them?  A:  Well, it didn't meet NSP's requirement.  Q:  The ASTM standard?  A:  Yeah.  The stamp on their boot for their PPE requirement.").)

home for a week prior to using them at NSP.  (Sharbono Dep. at 128; Wilhelm Decl. Ex.

10.)  Sharbono later wore the Red Wing Boots with gauze at NSP for several weeks, or

perhaps months, but stopped using the gauze because it was causing irritation to his foot.

(Sharbono Dep. at 129.)

**VI.     Sharbono uses steel-toed boots and then goes on extended leave**

Sharbono wore the Red Wing steel-toed boots without gauze for the next three

years while working at NSP.  The pain and other symptoms he experienced from wearing

the boot on his left foot – foot pain, shoulder pain, twitching, headaches, all of which he

ascribes to using the boots – worsened over that time.  (Sharbono Dep. 23, 134.)  After

Brenda McDermott replaced Foreman as his supervisor in February 2011, Sharbono

began taking increasing amounts of time off of work due to his exacerbating symptoms.

(Helling Decl. Ex. 6; Sharbono Dep. at 134, 146.)  McDermott eventually met with him

in October 2011 to discuss his time off; she suggested he explore applying for leave

under the Family and Medical Leave Act ("FMLA").  (Helling Decl. Ex. 6; Sharbono

Dep. at 149.)  Sharbono took that advice and applied for intermittent FMLA leave in

November 2011, in order to attend medical appointments or if he was "hurting, too much

pain to work."  (Sharbono Dep. at 151.)  His request was approved.  (Id. at 152.)

On April 12, 2012, McDermott met with Sharbono to discuss when he could leave

for medical appointments during the workday.  (Sharbono Dep. at 167-68; Wilhelm Decl.

Ex. 11.)  At that meeting, Sharbono requested that he not have to wear protective-toe

footwear, and he asked for a response to his request in writing.  (Wilhelm Decl. Ex. 11.)

McDermott replied that such a response would have to come from someone "higher up"

at NSP.  (Id.)  The record is unclear what, if anything, McDermott did in response to Sharbono's request.[8]

Regardless, on May 11, 2012, Sharbono began a lengthy FMLA leave, lasting until March 2013.  He exhausted the legally mandated 12 weeks of leave in June 2012,[9] but NSP permitted him to remain on FMLA leave through March 2013, paying him the entire time.  (Sharbono Dep. at 186-87.)

Meanwhile, on June 6, 2012, Sharbono saw his neurologist, Dr. Kathleen Rieke, complaining of "progressive worsening" of his condition due to "the rubbing of the protective toe footwear."  (Wilhelm Decl. Ex. 12.)  That same day, Dr. Rieke wrote McDermott and Kathy Gilman, an NSP "workforce relations consultant," advising that "[d]ue to the exacerbation of neuropathic pain associated with his foot injury, it is the opinion of [Sharbono's] medical team . . . [that] it is medically necessary [for] him to discontinue use of his safety toed footwear.  This is exacerbating the pain and worsening his disability."  (Helling Decl. Ex. 10.)  Also on June 6, Sharbono submitted a workers' compensation "injury/illness report," asserting June 6, 2012, as the "date of injury" and identifying a number of work restrictions, with no end date.  (Id.)  Several weeks later, Sharbono's union submitted to NSP a letter "requesting a waiver for protective footwear."  (Wilhelm Decl. Ex. 14.)  The letter provided that "safety boot wear (both

---

[8] Sharbono argues that McDermott "never got back to [him] regarding his request for reasonable accommodation."  (Mem. in Opp'n at 10.)  But the record is much more equivocal, as Sharbono's recollection of the events in 2012 was hazy in his deposition.

[9] The FMLA provides that an employee with a serious health condition is entitled to a total of 12 weeks of leave during any 12-month period.  29 U.S.C. § 2612(a)(1).

standard boots and modified boots) exacerbates his injured foot and should not be worn

ever again." (Id.)

## VII.   NSP proposes disability retirement

NSP responded to these submissions on August 1, 2012, in a conference call

including McDermott, Gilman, Sharbono, and his union representative, Shawn Daly.

(Helling Decl. Ex. 12.)  Daly explained that the union had not received an answer to its

June 2012 letter seeking a waiver of the PPE policy's protective-footwear mandate, and

Gilman replied that a waiver would not be granted.  (Id.)  McDermott's notes from the

call indicate there was some discussion of the possibility of light-duty work for Sharbono,

which would not have required safety boots, although ultimately that option was not

offered to him.  (Id.)[10]  As Sharbono had exhausted his FMLA leave and could not

continue on paid sick leave indefinitely, Gilman explained that he could elect a disability

retirement under his union's collective-bargaining agreement.  (Id.; see also McDermott

Decl. ¶ 4.)  A short time later, she formally denied Sharbono's waiver request in writing,

advising that "this same request . . . has been denied in the past" and that NSP "cannot

issue a waiver because [it] cannot eliminate the potential foot hazards that are present in

the daily work of a lineman.  Indeed, granting this waiver would be a violation of [NSP]

policy and a violation of OSHA standard 1910.136." (Helling Decl. Ex. 13.)

In October 2012, Sharbono, his wife, and Daly met with Gilman, McDermott, and

Carin Coomer-Kyllo, an NSP "Disability Solutions Specialist." (McDermott Dep. at 81;

---

[10] In her Declaration, McDermott avers that Gilman explained no light-duty work was available
at the time (McDermott Decl. ¶ 4), although her notes do not reflect that.

Helling Decl. Exs. 11, 16.)  Gilman offered Sharbono two options at that meeting:  a 90-day search for another position at NSP, or disability retirement as previously discussed. (Helling Decl. Ex. 11.)  Gilman made clear, however, that there were no guarantees the job search would yield another position, and even if it did, she could not guarantee it would be a union job.  She also advised that if Sharbono took a non-union job, he would no longer be eligible for disability retirement.  (McDermott Dep. at 86-87, 150-55; Sharbono Dep. at 206-10; Gilman Dep. at 26-28.)   According to Sharbono, Gilman recommended that he retire, rather than run the risk of losing union benefits.  (Sharbono Dep. at 207-08.)  Sharbono claims he felt no choice but to accept disability retirement, and he so informed NSP by a letter from his union dated October 12, 2012.  (Helling Decl. Ex. 14 ("I have requested a reasonable accommodation with [NSP] and through [its] refusal, I feel I have to accept a work-related disability retirement.").)

## VIII.   Later attempts are made to address Sharbono's foot problem

To process the request for disability retirement, Coomer-Kyllo reviewed Sharbono's ability to perform his job with accommodation and the steps NSP had taken up to that point to address his foot problems.  (Coomer-Kyllo Decl. ¶ 2.)  On November 19, 2012, she spoke with the "Job Accommodation Network" ("JAN") about potential accommodations.  (Id. ¶ 3; Helling Decl. Ex. 11.)  JAN recommended that she contact another company, Ellwood Safety, to explore foot guards that could be worn over existing shoes.  (Helling Decl. Ex. 11.)  JAN also advised that if appropriate footwear could not be found, the "only other option would be reassignment to another job."  (Id.) There is no evidence in the record indicating that Coomer-Kyllo spoke to Ellwood Safety.

Instead, on November 26, 2012, Coomer-Kyllo and Post recommended to Darla Figoli, NSP's Vice President for Human Resources, that Sharbono be transitioned to disability retirement. (Helling Decl. Exs. 11, 15.) Post expressly advised Figoli by memorandum that "Robert Gorman, MD has reviewed the medical reports and agrees [Sharbono] medically qualifies for disability retirement given we are unable to grant his request not to use safety shoes and be non-compliant with OSHA regulations. We have pursued other alternatives but they have not been successful." (Helling Decl. Ex. 15.) Figoli and Post then met to discuss the matter. (Figoli Dep. at 31-33.) According to Post, Figoli expressed concerns about the cost of transitioning Sharbono to disability retirement, as such benefits are paid from a trust for which she was responsible. (Post Dep. at 142-43; see also Figoli Dep. at 37-38.) As a result, Figoli directed Post to explore other potential accommodations that would allow Sharbono to continue working. (Figoli Dep. at 33.)

On December 28, 2012, Post notified Sharbono by letter that NSP was scheduling him to meet with Dr. Lance Silverman, a foot and ankle specialist. (Sharbono Dep. at 226-28; Post Decl. Ex. 1.) The letter provided that NSP had "explored a number of options with you in 2007; however, there may be advances in product design or technology since that time that will benefit you." (Post Decl. Ex. 1.) Accordingly, Sharbono was to attend the appointment with Dr. Silverman "to determine if there are additional accommodations" that could assist him. (Id.)

On January 9, 2013, Sharbono saw Dr. Silverman, who submitted a report to Post two weeks later. (Helling Decl. Ex. 27.) The report advised that Sharbono did not pose a

safety risk to himself or to others due to his foot and that he could perform the essential functions of his job with a footwear modification.  Specifically, Dr. Silverman recommended that Sharbono be permitted to wear a shoe "that fits the OSHA standards of steel-toed footwear but allows accommodation for non-irritation of the dorsum of his foot."  (Id.)  Though noting he was "not an expert in footwear," Dr. Silverman opined it should be "quite easy" to obtain "steel-toed boots . . . made in such a way [that] they do not cause abrasions on the dorsum of the foot.  A pedorthist can create a steel-toed boot that provides greater room in his toebox (and maybe sized differently) . . ., diminishing the area of contact and/or irritation on top of the boot."  (Id.)  He recommended having Minnesota Prosthetics and Orthotics ("MPO") perform this work.  (Id.)

Post contacted MPO a few weeks later and spoke to David Lewis.  (Helling Decl. Ex. 28; Post Decl. ¶ 3 & Ex. 2.)  Lewis said he would inquire of several footwear manufacturers and get back to Post promptly.  (Helling Decl. Ex. 28.)  A few days later, he reported that custom safety boots could in fact be created meeting the ASTM standard, which would take 4-6 weeks to manufacture once Sharbono was fitted.  (Helling Decl. Exs. 11, 28; Post Decl. ¶ 5 & Ex. 2.)  Post emailed Gilman and McDermott with this "good news," advising that once they could speak with Sharbono "regarding the accommodation," NSP could "move ahead" by "scheduling an appointment to have the 'molds' made."  (Helling Decl. Ex. 28.)  McDermott, trying to expedite the process, asked Post to schedule Sharbono for the fitting "as soon as the[] first appointment" was available, but Post responded that NSP first needed to meet with Sharbono to see

"whether he agreed to go or not." (<u>Id.</u>)  When McDermott replied that she did not believe

Sharbono could choose not to attend, Post responded, "He can always resign." (<u>Id.</u>)

On February 15, 2013, Gilman emailed McDermott a number of "talking points"

to discuss with Sharbono.  (Helling Decl. Ex. 20.)  She advised McDermott to telephone

Sharbono and inform him that he was expected to return to work on February 20, 2013;

he would perform light-duty work until his boots were completed.  (<u>Id.</u>; McDermott Decl.

¶ 8.)  Gilman also advised McDermott to warn Sharbono that his failure to return as

scheduled would be deemed a voluntary resignation.  (Helling Decl. Ex. 20.)  While she

told McDermott to "tweak" the talking points as she saw fit, Gilman instructed that the

phone call was "not a time for him to debate the issue." (<u>Id.</u>)

## IX.   NSP requires that Sharbono return to work

McDermott called Sharbono later that day and told him that he needed to return to

work on either Wednesday, February 20, or Thursday, February 21.  (Helling Decl. Ex.

30.)  Sharbono responded that he was in the midst of attending a "Chronic Pain Program"

on a daily basis.  (<u>Id.</u>)  When McDermott informed him that his failure to appear would

be deemed a resignation, he responded, "I guess it will be Thursday." (<u>Id.</u>)

But before Thursday, February 21 arrived, Sharbono's counsel emailed

McDermott, advising that Sharbono was participating in the pain program and

"request[ing] as a reasonable accommodation for his disability that [NSP] allow him to

complete the [program] without interruption . . . and change his report to work date to

March 11, 2013." (Helling Decl. Ex. 31.)  McDermott discussed this request with Post,

Gilman, and several others, including NSP's in-house counsel, and agreed to move

Sharbono's return-to-work date to March 11.  (McDermott Dep. at 192-94; Sharbono Dep. at 244-45.)

In the meantime, Post scheduled an appointment for Sharbono with Scott Langston at MPO; Lewis informed her that he would share with Langston the information about Sharbono's need for a custom-made boot and obtain a prescription for the boot from Dr. Silverman.  (Post Decl. ¶ 6 & Ex. 2.)  But when Sharbono arrived at the appointment on February 25, 2013, Langston told him that he was unaware why Sharbono was there and that he had not received anything from Dr. Silverman.  (Sharbono Dep. at 246; Langston Decl. ¶¶ 3-4.)  Sharbono explained the situation and his need for ASTM-compliant boots, and he told Langston to call Post for more information.  (Sharbono Dep. at 246-47; Langston Decl. ¶ 5.)

Before calling Post, Langston contacted Branier Orthopedics, a manufacturer of custom footwear, to "find out the type of requirements that [its] reinforced toe shoe meets."  (Wilhelm Decl. Ex. 15; see also Langston Dep. at 51.)  Brainer informed Langston that "no custom shoe meets the ASTM[] requirement because someone would have to watch the [manufacturing] process for each individual custom shoe."  (Wilhelm Decl. Ex. 15; Langston Dep. at 52.)  Langston then "contacted Betty Post and relayed her this message."  (Wilhelm Decl. Ex. 15.)[11]  Langston also told Post that he needed a

---

[11] Exhibit 15 is a set of notes Langston dictated on February 25, 2013, the day he met with Sharbono (see Langston Dep. at 56, 61), but Sharbono has filed a Declaration from Langston differing somewhat from these notes (Doc. No. 51).  In particular, the Declaration avers that Langston "did not tell Ms. Post that it was not possible to create custom footwear for Sharbono." (Id. ¶ 8.)  Rather, he advised her "that a custom protective boot could be made, but it could not be *stamped* with the ASTM[] stamp NSP was requiring."  (Id. ¶ 7 (emphasis added).)  Langston

prescription from Dr. Silverman before he could do anything to assist, but Post took no further action because "at th[at] point [she] understood that NSP's efforts to accommodate [Sharbono] had been exhausted." (Post Decl. ¶ 8; <u>see also</u> Post Dep. at 142.) However, she did not immediately advise Gilman or McDermott of this development; instead, she resubmitted Sharbono's disability retirement request to Figoli. (Post Dep. at 139-40; Post Decl. ¶ 8 & Ex. 2.)

## X.    **Sharbono returns to work but is then released**

Sharbono returned to light-duty work as scheduled on March 11, 2013. That same day, *before* learning about Post's conversation with Langston, McDermott and Gilman met with Sharbono, Daly, and another union representative. McDermott and Gilman told Sharbono that his custom boots were being manufactured and would take up to six weeks to be ready. (Sharbono Dep. at 171-72.) Daly responded that Sharbono did not believe a custom boot was actually being made, based on his conversations with Langston at the February 25 appointment. (<u>Id.</u> at 174; Wilhelm Decl. Ex. 11.) Gilman and McDermott were surprised, as they had gone into the meeting fully expecting Sharbono to be able to return to work with custom boots. (Gilman Dep. at 67.) It was only after this meeting that they contacted Post and learned what Langston had told her. (<u>Id.</u>; Post Dep. at 140.)

---

was cagey regarding these differences in his deposition, but ultimately he acknowledged that his notes were more accurate than the statements in the Declaration (which had been drafted by Sharbono's counsel) and he "can't tell you exactly what [he] told [Post] about that ASTM[] stamp." (Langston Dep. at 59; <u>see id.</u> at 59, 61 (repeatedly testifying he would "have to go with the notes"); <u>id.</u> at 57 ("Q: These notes do not say that you told Ms. Post that a custom boot could be made for Mr. Sharbono, do they? A: No, they do not.").)

Post emailed McDermott and Gilman later that day, apologizing for not speaking to them before meeting with Sharbono.  (Helling Decl. Ex. 24.)  She noted that while boots could be made "with either steel or fiberglass toes that would be similar" to the ASTM standard, "the boots are not constructed in an environment that is qualified to state the boots meet that standard and be able to 'mark' the[m]."  (Id.)  As a result, it "appear[ed] that we have exhausted the searches for resources that would allow this to occur," and hence she was "put[ting] the disability retirement request into action."  (Id.) Post then updated Figoli on the situation, and Figoli approved Sharbono's disability retirement on March 13, 2013.  (Post Dep. at 144-45; Post Decl. ¶ 10.)

The following day, McDermott met with Sharbono and Daly, told them a custom boot could not be made, and advised that the disability retirement request would be processed.  (Helling Decl. Ex. 22; Wilhelm Decl. Ex. 16; Sharbono Dep. at 259-60.)  In total, Sharbono worked three days of light duty before being transferred to retirement status.  (McDermott Dep. at 125.)  He was not offered additional light-duty work before being let go.  His disability retirement status became effective on April 1, 2013.

## XI.    Sharbono alleges discrimination

Approximately one month later, Sharbono filed a charge of disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").  On May 29, 2015, the EEOC determined there was no probable cause to believe discrimination or retaliation had occurred and issued a right-to-sue letter.  A short time later, Sharbono commenced the instant action, alleging NSP had discriminated and retaliated against him in violation of the ADA and the MHRA.  With discovery complete,

NSP now moves for summary judgment. Its Motion has been fully briefed, the Court heard oral argument on September 28, 2016, and the Motion is now ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

Sharbono alleges that NSP violated the ADA and the MHRA by (1) failing to accommodate his disability, (2) discriminating against him on account of his disability,

and (3) retaliating against him after he requested accommodation.[12]   The Court considers each claim in turn, ultimately concluding that none creates a genuine issue for trial.

## I.      Failure to accommodate

Under both the ADA and MHRA, an employer is required to provide reasonable accommodation to the known physical limitations of an otherwise qualified employee with a disability, unless doing so would impose an undue hardship on the employer.  42 U.S.C. § 12112(b)(5)(A); Minn. Stat. § 363A.08, subd. 6.  "To determine whether an accommodation for the employee is necessary, and if so, what that accommodation might be, it is necessary for the employer and employee to engage in an 'interactive process.'" Schaffhauser v. United Parcel Serv., Inc., 794 F.3d 899, 906 (8th Cir. 2015) (quoting Peyton v. Fred's Stores of Ark., Inc., 561 F.3d 900, 902 (8th Cir. 2009)).  An employee alleging that his employer did not engage in this interactive process must show (1) the employer knew about his disability, (2) he requested accommodation, (3) the employer did not make a good-faith effort to assist him in seeking accommodation, and (4) he could have been reasonably accommodated but for the employer's lack of good faith. Peyton, 561 F.3d at 902.

Here, Sharbono claims that NSP did not appropriately engage in the interactive process, "based on [its] decision to transition [him] to disability retirement, a decision that was communicated to [him] on March 14, 2013, after failing to make a good faith effort to accommodate his disability."  (Mem. in Opp'n at 20.)  In the Court's view,

---

[12] Sharbono's claims under the MHRA and ADA are analyzed in the same fashion, see, e.g., Kobus v. Coll. of St. Scholastica, Inc., 608 F.3d 1034, 1038 (8th Cir. 2010); Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004), and he does not argue otherwise.

however, the record does not support his argument that NSP failed to make a good-faith effort to accommodate him.[13]

When Sharbono "renewed" his request for a waiver of NSP's safety-toed footwear requirement in 2012, the company had already taken several steps to find an appropriate solution. It had arranged multiple meetings with foot and shoe specialists in 2008 to attempt to find footwear that would satisfy its requirements and the OSHA regulation. It offered him a number of options, including using steel-toed overshoes, diabetic or wool socks, or steel-toed boots with his feet wrapped in gauze. (See Sharbono Dep. at 130 (acknowledging "there were a number of meetings and appointments and efforts to address [his] left foot in 2008").) Indeed, Sharbono successfully wore the Red Wing boots selected by Winskowski from 2008 to 2011, and he points to no evidence indicating he sought accommodation during that time. Further, NSP agreed to have made, and partially pay for, a custom boot that it believed was ASTM compliant.

Accordingly, by the time he renewed his request in 2012, the company had already attempted to accommodate his foot issues. But the company went further, approving him for FMLA leave and then *extending* that leave *with pay* for 9 months beyond the legally mandated 12-week period, despite being well aware of the difficulty finding Sharbono a

---

[13] NSP argues that claims based on conduct predating April 17, 2012 – one year prior to Sharbono's EEOC charge – are time-barred. (Def. Mem. at 19-20.) But as Sharbono correctly notes, conduct occurring before April 2012 may properly be considered by the Court "as relevant background" to NSP's alleged failure to accommodate in 2012 and 2013. Rorie v. United Parcel Serv., Inc., 151 F.3d 757, 761 (8th Cir. 1998).

satisfactory shoe.[14]  Then, during that extended leave, NSP offered him the option to seek

another job within the company.  See Knutson v. Schwan's Home Serv. Inc., 711 F.3d

911, 916 (8th Cir. 2013) (option to apply for other jobs was reasonable accommodation).

Sharbono describes the company's offer as an "ultimatum" because he faced a

Hobson's choice:  a job search without guarantees (and the possible loss of union

benefits) or disability termination.  (Mem. in Opp'n at 24-25.)  But a proposed

accommodation need only be *reasonable*, not perfect, and he cites no authority for the

proposition that an employer must accommodate an employee by transferring him to a

position with comparable pay and benefits.  See, e.g., Cravens v. Blue Cross & Blue

Shield of Kan. City, 214 F.3d 1011, 1019 (8th Cir. 2000) ("[A]n employer may reassign

an employee to a lower grade and paid position if the employee cannot be accommodated

in the current position and a comparable position is not available.") (citation omitted); 29

C.F.R. § 1630 app. ("[Although] the preference of the individual with a disability should

be given primary consideration[,] . . . the employer providing the accommodation has the

ultimate discretion to choose between effective accommodations, and may choose the

less expensive accommodation or the accommodation that is easier for it to provide.");

see also Noll v. Int'l Bus. Mach. Corp., 787 F.3d 89, 95 (2d Cir. 2015) ("[E]mployers are

not required to provide a perfect accommodation or the very accommodation most

strongly preferred by the employee.").  Indeed, by this logic an employer would be

---

[14] Sharbono argues the leave was "never presented . . . as a reasonable accommodation" (Mem. in Opp'n at 24) but cites no authority that an employer must use that label when accommodating an employee.  Indeed, if the paid leave here were not a reasonable accommodation, then what was it?  Why else would NSP have continued paying him to not work?

obligated to create a new position for an employee when no other accommodation was possible.  That is clearly not the law.  See, e.g., Minnihan v. Mediacom Commc'ns Corp., 779 F.3d 803, 814 (8th Cir. 2015); Cravens, 214 F.3d at 1019.  As was true in Rehrs v. Iams Co., NSP "encouraged [Sharbono] to apply for other positions," but he declined and "[i]nstead, [he] applied for, and was granted, . . . partial disability leave."  486 F.3d 353, 359 (8th Cir. 2007).  Nothing more was required.[15]

NSP did not stop there, however.  Rather, before processing his disability retirement, it contacted Dr. Silverman and, later, Lewis and Langston at MPO, in order to explore the possibility of manufacturing protective boots.  Nothing in the record suggests that NSP was unwilling to permit Sharbono to return to his previous work as a lineman *if* adequate footwear could be found.  Indeed, it fully expected he would return to work when Lewis reported in 2013 the "good news" that custom-made boots could be manufactured.  It was only *after* Langston informed Post that boots satisfying the ASTM standard could not be made that the company finally ended its repeated efforts to obtain satisfactory footwear and transferred Sharbono to retirement status.[16]  In the Court's

---

[15] Sharbono argues that NSP was obligated to "identify appropriate job vacancies" for him. (Mem. in Opp'n at 32.)  To be sure, some cases have imposed a duty on employers to locate possible alternative jobs as accommodations.  But those cases indicate the obligation arises only when an employee actually expresses some interest in alternative positions.  See, e.g., Miller v. Ill. Dep't of Corr., 107 F.3d 483, 487 (7th Cir. 1997) (finding such a duty when "an employee . . . just says to the employer, 'I want to keep working for you—*do you have any suggestions?*'") (emphasis added).  By contrast here, Sharbono only expressed interest in *working as a lineman*, and he rejected the possibility of a job search within the company.

[16] Sharbono argues that Langston "did not tell Post that it was impossible to create custom footwear that complied with [the ASTM, but] [i]nstead, he told Post he likely could make a boot for Sharbono, it just would not have the ASTM stamp."  (Mem. in Opp'n at 26-27 (emphasis in

view, these facts undermine Sharbono's contention that the company failed to undertake good-faith efforts to accommodate him.  See, e.g., Minnihan, 779 F.3d at 813-14 (concluding defendant made good-faith effort to accommodate plaintiff where "[s]everal members of [its] Human Resources department, as well as [the plaintiff's] supervisors, spoke with him over a period of months regarding possible accommodations" and "provided [him] with information about other jobs within the company, as well as giving him time on the job to apply for other positions").

Sharbono characterizes NSP's efforts as "insufficient" (Mem. in Opp'n at 26), but that label could easily be applied to *his* efforts.  The interactive process required by the ADA is necessarily bilateral; this is why it is called "interactive."  See, e.g., Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008) ("Although the degree of interaction required varies in accordance to the circumstances of each case, the process requires open communication *by both parties*, and an employer will not be held liable if it makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed.") (emphasis added) (internal quotation marks and citation omitted).  And yet, the only accommodation Sharbono ever requested – despite years of meetings, medical appointments, visits with orthotists, the involvement of his union and his lawyers, and multiple attempts to make custom boots – was to be *completely exempt* from the safety-footwear requirement, notwithstanding the mandate in the OSHA regulation.  There is no evidence he offered any other alternatives or discussed

---

original) (quoting Langston Decl. ¶¶ 7-9).)  But as already noted, the record does not support that contention.  (See supra note 11.)

with the company ways to satisfy the regulation while continuing to work as a lineman; he simply wanted the freedom not to wear safety-toed boots, as he had done prior to 2008. Perhaps most notably, Sharbono claims that in 2012, OSHA informed him that NSP was not correctly interpreting the regulation and there were workarounds for his situation, yet he acknowledges he never informed NSP of this despite the involvement of his union and experienced employment counsel (including his brother) at the time. Based on the record, it would be difficult to conclude that NSP did not undertake reasonable efforts "to communicate" with Sharbono to try to find "accommodations based on the information it possessed," including his stated desire to work as a lineman without safety-toed boots. Enica, 544 F.3d at 339.[17]

In any event, none of Sharbono's contentions about NSP's efforts is availing:

- Sharbono argues that Post "made no effort to ascertain whether Langston was qualified to make the custom boot." (Mem. in Opp'n at 26.) But this makes little sense, as Post was specifically referred by Dr. Silverman's company (MPO), and when she reached out, she was assured by Lewis that custom-made boots meeting the ASTM specification could be manufactured. (Helling Decl. Exs. 11, 27-28; Post Decl. ¶ 5 & Ex. 2.)[18]

---

[17] Sharbono argues NSP's "misinterpretation" of the regulation evinces "bad faith," since nothing therein requires footwear to be *stamped* ASTM-compliant (as opposed to simply *meeting* the standard). (Mem. in Opp'n at 28-32.) Of course, the *PPE policy* required footwear to be so marked, but that aside, the evidence is clear that Sharbono and NSP employees repeatedly were told that custom footwear *meeting* the ASTM standard simply could not be manufactured. (Wilhelm Decl. Exs. 7, 9, 15.) In any event, even if NSP misinterpreted the regulation as requiring ASTM-*stamped* footwear, that error does not, in the Court's view, suggest NSP was operating in bad faith here, especially since Sharbono never expressed to the company that it was incorrectly interpreting the regulation. See Lors v. Dean, 595 F.3d 831, 835 (8th Cir. 2010) (*per curiam*) ("poor decision-making provides no basis for relief under the ADA").

[18] Sharbono assails Post for failing to "ascertain whether Langston was qualified to make the custom boot" (Mem. in Opp'n at 26), yet he relies heavily on Langston's opinion that "a custom protective boot could be made" (id. at 16, 30).

- Sharbono argues that no one from NSP (i) contacted Langston to bring him up to speed on the situation or (ii) made sure that MPO received a prescription for a custom-made boot from Dr. Silverman. (Mem. in Opp'n at 26.)  This ignores, however, that Lewis informed Post that *he* would explain the situation to Langston – after all, Langston was Lewis's colleague at MPO – and *he* would take care of obtaining the prescription.  (Post Decl. ¶ 6 & Ex. 2.)

- Sharbono argues that, after learning from Langston that a boot could not be made, Post took no further steps, such as contacting other footwear manufacturers or contacting OSHA to explore alternatives. (Mem. in Opp'n at 27.)  But at that juncture, Post had been involved with Sharbono for more than five years, and every single specialist along the way – including Langston, Dr. Schleichert, and Great Steps – had explained that footwear could not be custom-made while satisfying the ASTM standard.  (See also Helling Decl. Ex. 15 (November 26, 2012 memorandum from Post to Figoli noting, "*We have pursued other alternatives but they have not been successful.*") (emphasis added).)

At bottom, the Court does not believe the record supports Sharbono's argument that a genuine issue of fact exists regarding the adequacy of NSP's efforts.  To be sure, there appears to have been some breakdown in communication between the parties, and the interactive process did not work as well as it might have.  But in the Court's view, no reasonably jury could conclude that NSP failed to make a good-faith effort to assist Sharbono in seeking accommodation.  Accordingly, it is entitled to summary judgment on his failure-to-accommodate claim.

## II.     Discrimination

Sharbono next alleges that NSP discriminated against him by terminating his employment – or, more accurately, transferring him to disability-retirement status – on account of his disability.  (Mem. in Opp'n at 33-39.)  In the absence of "direct evidence,"

which Sharbono does not identify, his claim is analyzed under the familiar McDonnell Douglas burden-shifting framework.  E.g., Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 (8th Cir. 2007); Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003).  Under that framework, he must first establish a prima facie case of discrimination, after which the burden shifts to NSP to articulate a legitimate, nondiscriminatory reason for its action.  If it does so, the burden shifts back to Sharbono to show NSP's proffered reason is a pretext for discrimination.  E.g., Dovenmuehler, 509 F.3d at 439.

Here, the parties dispute whether Sharbono has established a prima facie case of discrimination, focusing on the second element:  whether he was qualified to perform the essential functions of his job with or without reasonable accommodation.  (See Def. Mem. at 33-35; Mem. in Opp'n at 34-36.)  But the Court need not wade into that dispute, as NSP has proffered a legitimate, nondiscriminatory reason for ending Sharbono's employment:  "his inability to comply with the safety-footwear requirements applicable under OSHA and NSP's PPE policy."  (Def. Mem. at 36.)  Accordingly, the Court may proceed "directly" to the question of pretext.  E.g., U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.  The district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff.") (internal quotation marks and citation omitted); Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007) (same).

In an attempt to show pretext, Sharbono argues that (1) NSP's proffered reason for his "termination" is unworthy of credence and (2) his foot problems "influenced [NSP's] lackluster efforts and lack of diligence in attempting to find an accommodation for Sharbono." (Mem. in Opp'n at 36-37.)  Neither argument is persuasive.

Recycling an argument already discussed, Sharbono first contends that NSP's proffered reason for his termination was pretextual because the OSHA regulation does not actually require employees to wear boots marked with an ASTM stamp. (Id.)  But this argument misses the mark, because the dispositive question is not whether Sharbono was (or was not) able to comply with the regulation.  Rather, the question is whether NSP, in good faith, *believed* he was unable to comply with it.  See, e.g., McCullough v. Univ. of Ark. for Med. Sci., 559 F.3d 855, 862 (8th Cir. 2009) ("A plaintiff seeking to survive an employer's motion for summary judgment must . . . show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that" termination was warranted.); McNary v. Schreiber Foods, Inc., 535 F.3d 765, 769 (8th Cir. 2008).  And for the reasons stated above, the Court does not believe the record creates a genuine issue on that question.

Sharbono's second argument fares no better.  He contends that NSP made little effort to accommodate him, thus suggesting it "harbored animosity toward [him] due to his disability." (Mem. in Opp'n at 37.)  But as previously noted, the company explored numerous options to find appropriate footwear, permitted him nine months of paid leave beyond his FMLA entitlement, offered him the option to apply for other jobs and then, before transferring him to retirement status, again attempted to find ASTM-compliant

boots he could wear.  Sharbono himself testified that "there were a number of meetings and appointments and efforts to address [his] left foot in 2008" (Sharbono Dep. at 130), and the record indicates that NSP's efforts continued once Sharbono renewed his request to be exempt from the PPE policy in 2012.  The record simply does not support the "animosity" Sharbono attempts to foist onto NSP.

Sharbono also points to a handful of matters which he contends demonstrate discriminatory animus, but in the Court's view he either overstates their significance or mischaracterizes them.  He cites, for example, an August 10, 2008 memorandum sent from Foreman to Daly discussing "events concerning insubordination and Jim," some of which concerned his requests for accommodation.  (Helling Decl. Ex. 54.)  But Foreman was not involved in the decision to transfer him to disability retirement, the only adverse action in question here.  See, e.g., Walton v. McDonnell Douglas Corp., 167 F.3d 423, 426 (8th Cir. 1999) ("Not all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support . . . an inference [of discrimination].  For example, stray remarks in the workplace, statements by nondecisionmakers, or 'statements by decisionmakers unrelated to the decisional process itself will not suffice.") (internal quotation marks and citation omitted).  In any event, some items in the memorandum reasonably could be labeled "insubordinate."  For instance, the memorandum indicates that Sharbono bristled at the directive to call Foreman when he was going to miss work, and he repeatedly delivered medical notes to persons other than Foreman despite being told not to do so.  (See Helling Dec. Ex. 54.)

Sharbono next notes that McDermott documented a conversation with him in 2011 regarding his use of sick time, noting that she was doing so "in case anything should happen at a later date." (Helling Decl. Ex. 6.) But the Court perceives no nefarious motive from this statement, since by that time Sharbono had lodged repeated complaints with the company about wearing safety-toed boots and the issues they were causing his foot; the Court agrees with NSP that documenting a conversation in such a situation is a "good HR and management practice[]." (Reply at 7.)[19] Moreover, it is undisputed that McDermott *encouraged* Sharbono to apply for FMLA leave in November 2011 to deal with his medical issues, which was approved, and then pushed to *expedite* the construction of his custom boots from MPO in 2013 to get him back to work. These facts counter the notion that McDermott was intending to discriminate against him.

Sharbono cites an oral reprimand he received from McDermott after she observed him at a Buffalo Wild Wings restaurant on a day he had called in sick, purportedly because he was suffering a migraine attributed to his foot condition. (Helling Decl. Ex. 6.) He claims McDermott reprimanded him "despite receiving medical documentation excusing him from work." (Mem. in Opp'n at 37.) But the record suggests this doctor's note was prepared *after* the incident and the reprimand. (See Helling Decl. Exs. 6, 38; Sharbono Dep. at 146-47.) In any event, in the Court's view an employer could reasonably believe an employee is malingering, even when he has been excused from

---

[19] The same is true with respect to Sharbono's allegation that "McDermott documented almost verbatim the conversations [he] had during his last few days at work . . . before he was terminated" (Mem. in Opp'n at 38), as by then both Sharbono's union and his lawyers were involved in the matter.

work, for going out to eat on a day he has called in sick due to a migraine.  The reprimand does not reasonably suggest discrimination.

Sharbono also notes that Post told McDermott "he can always resign" if he did not agree to attend the appointment scheduled for him with MPO in early 2013.  (Mem. in Opp'n at 37-38.)  But he takes this comment out of context.  As noted above, Post made the remark only after McDermott had asked if Sharbono had any option *not* to attend the MPO appointment.  One option, of course, would have been for him to resign rather than attend.  This factual statement, therefore, cannot reasonably be read to reflect any intent to discriminate.

Sharbono also contends that McDermott and Gilman "were repeatedly informed [his] disability and pain were worsening in 2011, but ignored those facts and failed to offer any solutions or accommodations."  (Id. at 38.)  The evidence he cites, however, does not support that contention.  Rather, the record reflects that McDermott was surprised in October 2011 with the amount of time Sharbono had been taking off.  (Helling Decl. Ex. 6.)  In fact, when Sharbono took sick time, he was not calling in to McDermott but rather to someone else (Lynn Rademacher), and he asked her "not to tell" McDermott.  (Id.)  And, once McDermott learned of the amount of time Sharbono had been missing, she suggested Sharbono seek FMLA leave, which was approved.

Finally, Sharbono argues that when McDermott called to inform him that he was required to return to work in February 2013, she ignored that he was attending the Chronic Pain Program, threatening him with termination if he did not appear (as instructed by Gilman).  (Mem. in Opp'n at 38.)  But Gilman testified that *all* employees

returning from medical leave would receive the same "work directive" (Gilman Dep. at 83), and hence there is no evidence Sharbono was treated differently than other employees on account of his condition.  Regardless, it is undisputed that after McDermott discussed the issue with others, Sharbono's request to delay his return-to-work date was *granted*.  The Court perceives no discriminatory animus from these facts.

Simply put, the Court believes the evidence relied upon by Sharbono, whether viewed individually or cumulatively, does not create a triable issue "*both* that [NSP's] articulated reason . . . was false *and* that discrimination was the real reason" for his termination.  McNary, 535 F.3d at 769 (emphases added).  The discrimination claim, therefore, must be dismissed.  See, e.g., Haggenmiller v. ABM Parking Servs., Inc., 837 F.3d 879, 886-87 (8th Cir. 2016) (even a weak issue of material fact is insufficient to defeat summary judgment in discrimination case).

## III.   Retaliation

In his final claim, Sharbono alleges that NSP retaliated against him in violation of the ADA and MHRA.  The crux of this claim is that he requested accommodation in 2012 and 2013, complained about NSP's "refusal" to accommodate him, and was subsequently fired.  (See Mem. in Opp'n at 39-40.)  This claim, too, is evaluated using the McDonnell Douglas framework.  E.g., EEOC v. Prod. Fabricators, Inc., 763 F.3d 963, 972 (8th Cir. 2014).

Once again, the Court will assume Sharbono has established a prima facie case of retaliation and proceed directly to the question of pretext.  And as with his discrimination claim, the Court determines that Sharbono has failed to create a genuine issue that NSP

terminated his employment in retaliation for seeking accommodation in 2012 and 2013.

Indeed, in an attempt to show pretext, Sharbono points to the same smattering of events

discussed above in connection with his discrimination claim allegedly showing a "history

of discriminatory animus."  (<u>See</u> Mem. in Opp'n at 41.)  The Court finds that evidence

unavailing, for the reasons already noted.[20]

CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that NSP's Motion for Summary Judgment (Doc. No. 34) is **GRANTED**

and Sharbono's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.  All

other pending Motions are **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  November 18, 2016                        s/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge

---

[20] As the Court concludes all of Sharbono's claims fail on the merits, it need not address NSP's alternative argument that Sharbono failed to mitigate his damages following his termination.

**James Sharbono v. Northern States Power Co., Civ. No. 15-3351 (RHK/LIB)**
Table of individuals involved

| | |
|---|---|
| Steve Christianson | NSP employee, title not specified in the record |
| Carin Coomer-Kyllo | NSP disability solutions specialist |
| Shawn Daly | Sharbono's union representative |
| Karyn Davis | NSP corporate safety consultant |
| Darla Figoli | NSP Vice President for human resources |
| Dan Foreman | Sharbono's supervisor until February 2011 |
| Kathy Gilman | NSP workforce relations consultant |
| Dr. Thomas Jetzer | Physician who performed Sharbono's fitness-for-duty evaluation in 2008 |
| Scott Langston | Orthotist at Minnesota Prosthetics and Orthotics |
| David Lewis | Orthotist at Minnesota Prosthetics and Orthotics |
| Brenda McDermott | Sharbono's supervisor commencing in February 2011 |
| Betty Post | NSP's manager of disability solutions |
| Dr. Kathleen Rieke | Sharbono's neurologist |
| Dr. David Schleichert | Sharbono's podiatrist in 2008 |
| James Sharbono | Plaintiff, line electrician at NSP |
| Dr. Lance Silverman | Foot and ankle specialist who evaluated Sharbono in 2012 |
| John Stumph | Foreman's supervisor |
| Louis Winskowski | Orthotist at Foot Support |
| Dr. Patrick Zook | Sharbono's treating physician in 2008 |